IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.A. MISSION CORPORATION, a California corporation; AZAR ASSOCIATES, LLC, a California limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>BP WEST COAST PRODUCTS LLC, a Delaware limited liability company; and DOES 1 through 10, inclusive,<br><br>Defendants. | No. C 18-03456 WHA<br><br>**ORDER GRANTING PRELIMINARY INJUNCTION** |

**INTRODUCTION**

In this action, a gas station franchisee moves to preliminarily enjoin an oil company from terminating its franchise agreements. To the extent stated below, a preliminary injunction is **GRANTED**.

**STATEMENT**

Plaintiff S.A. Mission Corporation (owned by Naifeh Azar) owns and operates an ARCO-branded gas station and am/pm mini market in San Francisco. In August 2006, S.A. Mission (by assignment) and defendant BP West Coast Products ("BPWCP") entered into two franchise agreements — a Contract Dealer Gasoline Agreement ("the gas agreement") and an am/pm Mini Market Agreement ("the am/pm agreement") (Dkt. Nos. 1 ¶ 11; 18 ¶ 1, Exh. 1, 2).

Both franchise agreements contained provisions relating to what BPWCP refers to as "image standards." Under these provisions, S.A. Mission agreed to maintain the premises in good repair. With respect to the am/pm agreement, S.A. Mission further agreed to maintain the mini market according to standards set forth in BPWCP's store systems manuals. These provisions also provided that BPWCP would perform periodic inspections and that repeated failure or poor performance would be grounds for termination or nonrenewal of the agreement (Dkt. Nos. 1, Exh. 2 ¶ 14.5; 2 ¶¶ 3.01, 10.1).

Beginning 2013, BPWCP enforced its image standards for both the gas station and am/pm mini market through its unified Consumer and Operations Retail Excellence ("CORE") program — which is based on standards set forth in BPWCP's store system manuals — and employed a third party to conduct quarterly inspections of franchisee stations. Under BPWCP's CORE program, franchisees had to obtain an inspection score of at least 70 percent to be considered in compliance with the franchise agreements. (The agreements themselves do not call out 70 percent compliance, nor do they call out the CORE program.) (Dkt. Nos. 18-4 at 2; 35 at 2; 89 ¶ 9).

In January 2017, BPWCP instituted a more muscular program, one with a CORE "default escalation process." Under this new process, any station failing a CORE inspection (*i.e.*, receiving a score below 70 percent) would receive a notice of default. Continued failure would result in additional default letters "with escalating consequences up to and including the potential for non-renewal or termination of the franchise and gas agreements" (Dkt. Nos. 89 ¶ 9; 90 ¶ 14).

Under the new CORE default escalation process, S.A. Mission failed four consecutive quarterly CORE inspections. These failures prompted three default notices and opportunities to cure. After the fourth failed CORE inspection, BPWCP sent S.A. Mission a "90 Day Notice of Termination and Demand for Payment" on March 28, 2018. The notice advised S.A. Mission that the franchise agreements would be terminated on July 2, 2018 (Dkt. Nos. 18-4, 18-5).

S.A. Mission filed the instant motion to preliminarily enjoin BPWCP from terminating the franchises. During the first hearing on the instant motion on September 7, 2018, a

temporary stay of the termination was ordered pending an evidentiary hearing held on November 13, 2018, and ruling. BPWCP was allowed to inspect the premises at will in the interim (unannounced) (Dkt. No. 42). Additional evidentiary hearings followed on December 19 and December 27, 2018.

In sum, S.A. Mission has received a failing CORE inspection score *six* consecutive times — two of which were scored in the two months intervening between the initial motion hearing and the subsequent November 13, 2018, evidentiary hearing. (To its credit, S.A. Mission received passing scores on its most recent CORE inspections in November and December of 2018.) BPWCP argues that termination of the franchise agreements based on the CORE default escalation process is valid pursuant to the pertinent provisions within the agreements.

S.A. Mission contends that the CORE inspections are arbitrary and pretextual for BPWCP's alleged true motive of purchasing its station at a cheap price in order to increase BPWCP's "company-owned/operated" portfolio (Dkt. Nos. 70-5; 70-6; 74 at 9–11).

This order follows full briefing and oral argument, followed by expedited discovery, multiple supplemental briefings, and three subsequent evidentiary hearings.

**ANALYSIS**

**1. PETROLEUM MARKETING PRACTICES ACT.**

The PMPA is federal legislation "intended to protect gas station franchise owners from arbitrary termination or nonrenewal of their franchises with large oil corporations and gasoline distributors." *DuFresne's Auto Serv., Inc. v. Shell Oil Co.*, 992 F.2d 920, 925 (9th Cir. 1993). To that end, the PMPA provides that a franchisor may only terminate or decline to renew a franchise relationship based upon one of the specifically enumerated grounds in Section 2802(b)(2) of the PMPA and upon the franchisor's compliance with its notice requirements.

If a franchisor fails to comply with a statutory requirement, a franchisee may bring an action to prevent termination or non-renewal. Specifically, a franchisee "may obtain preliminary injunctive relief if: (1) it establishes that the franchise has been terminated and that 'there exists sufficiently serious questions going to the merits to make such questions a fair

3

ground for litigation,' and (2) the court determines that, on balance, the hardships imposed upon the franchisor by issuance of preliminary injunctive relief are less than the hardships that would be imposed upon the franchisee in the absence of such relief." *Khorenian v. Union Oil Co. of California*, 761 F.2d 533, 535 (9th Cir. 1985) (citing 15 U.S.C. § 2805(b)(2)(A) and (B)).

"[O]nce the franchisee establishes that the franchise relationship has been terminated or that it has not been renewed, the franchisor 'shall bear the burden of going forward with evidence to establish as an affirmative defense that such termination or non-renewal was permitted' under one of the statutorily enumerated grounds." *Ibid*. (quoting 15 U.S.C. § 2805(c)). To rebut the franchisor's showing, "the franchisee need show only the existence of 'sufficiently serious questions' as to the propriety of the termination under the Act to present a 'fair ground' for litigation." *Id*. at 536.

"The test for the issuance of a preliminary injunction under the PMPA is more liberal than that in the general run of cases." *Id*. at 535. In sum, "a franchisee is entitled to a preliminary injunction if the balance of hardship tips in his favor and there is a 'reasonable chance' that the franchisor will be unable to prove that the termination was permissible" under the PMPA, that is, there are "sufficiently serious questions" as to whether the termination was proper. *Id*. at 535–36.

While the PMPA certainly applies to the gas agreement, the parties dispute whether the PMPA also applies to the am/pm agreement (Dkt. Nos. 107, 109). Outside the PMPA, under our court of appeals' more stringent but sliding scale test for granting preliminary injunctions, S.A. Mission must demonstrate that: (1) serious questions going to the merits were raised, (2) the balance of hardships tips sharply in the S.A. Mission's favor, (3) there is a likelihood of irreparable harm, and (4) that the injunction is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–36 (9th Cir. 2011) (incorporating factors from *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)).

Here, even assuming the more stringent four-factor test applies to the termination of both the gas agreement and the am/pm agreement, this order finds that S.A. Mission has met the more stringent four-factor test for both franchise agreements.

4

**2.    SERIOUS QUESTION GOING TO THE MERITS.**

BPWCP's notice of termination cited two statutory grounds for termination: (1) "failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship," and (2) "failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise" after having received written notice of such failure and having been afforded a "reasonable opportunity" to comply with the provisions in question. 15 U.S.C. § 2802(b)(2)(A) and (B); *Khorenian*, 761 F.2d at 535. Both are based on the CORE inspections.

S.A. Mission, however, has shown that there is a "reasonable chance" that BPWCP will be unable to prove that the termination of both franchises was permissible under the agreements.

### A.    Serious Questions Regarding The CORE Inspection Regime.

Under both franchise agreements, S.A. Mission agreed to maintain "image standards" as set forth in BPWCP's store systems manuals and undergo periodic inspections by BPWCP to monitor compliance (Dkt. No. 35 at 3). The gas agreement does not mention the systems manual or CORE inspections, and only provided the following (Dkt. No. 1, Exh. 2 ¶ 14.5):

> 14.5 Standards. The Premises must be clean, well maintained, and graffiti free, with structures, driveways and pavement in good repair. BPWCP will perform periodic inspection for which repeated failure or poor performance is grounds for termination or nonrenewal of this Agreement.

The am/pm agreement provided (Dkt. No. 18, Exh. 2 ¶¶ 3.01, 10.1):

> 3.01 Operator agrees that it shall operate the Store and maintain the Premises in accordance with the standards, methods, procedures, requirements, instructions, food specifications and equipment specifications set forth in the am/pm Store Systems/Operations Manual . . . and any and all subsequent amendments and supplements thereto. . . .
>
> 10.1 Operator shall comply with the housekeeping and maintenance provisions set forth in the Systems Manual and shall maintain the Premises, Store and Store Equipment in a clean, orderly, safe, graffiti free, sanitary and operable condition. BPWCP shall perform periodic inspections, for which repeated failure or poor performance is grounds for termination or nonrenewal of this Agreement.

These franchise provisions are both reasonable and of material significance to the franchise relationship, as BPWCP (and all other franchisees) have an "obvious stake in the maintenance

of its image with the public." *Walters v. Chevron U. S. A., Inc.*, 476 F. Supp. 353, 356 (N.D. Ga. 1979), *aff'd*, 615 F.2d 1135 (5th Cir. 1980).

The termination notice listed S.A. Mission's last five scores (which are given every quarter) — the last four of which fell below the 70 percent passing score.[1] The notice of termination explained that S.A. Mission must obtain a "passing CORE Operations Inspection Score of 70% as required pursuant to Section 1 of the Store Systems Manual, Section 14.5-Standards of the Gas Agreement, and Section 10.01 of the Mini Market Agreement" (Dkt. No. 18-4 at 2). That requirement, however, is only found in the store systems manual, not in the agreements themselves (Dkt. No. 89-1 at 5):

> BP Requires that all sites participate in BP's Operational Standards Inspection Program. The program incorporates an Operational site inspection, Mystery Shop, and Food Safety Index component.
>
> BP will perform Inspections throughout the year to ensure compliance with the Operational Standards Program. Each facility will be evaluated quarterly on the *ampm* Inspection Program by way of an operational inspector and a separate consumer mystery shop inspection. The passing quarterly score for the *ampm* inspection is 70%.

The notice explained that these scores "demonstrat[ed] a continued pattern of repeated failure to pass the CORE Operations Inspections," despite the fact that BPWCP "permitted an extended period of time for [S.A. Mission] to cure the defaults set forth in the Three Default Notices" issued on June 27, 2017, September 20, 2017, and January 12, 2018 (*id*. at 1–2). The notice then explained that the aforementioned reasons were valid grounds for termination under Sections 2802(b)(2)(A) and (B) of the PMPA.

S.A. Mission does not dispute that it received these failing CORE inspection scores, now six times in a row.[2] Rather, S.A. Mission argues that some of the standards "are arbitrary and make no sense" and that certain "inspectors and BPWCP Representatives are bribed by franchisees for favorable treatment when it comes to these CORE Inspections and those, like S.A. Mission, who don't participate in such conduct are punished" (Dkt. No. 17 at 5). S.A.

---

[1] Specifically, the premises scored 59.46%, 58.65%, 59.88%, and 64.76%.

[2] Nor does it dispute that it failed sixteen times prior to the CORE escalation program.

6

Mission, however, produced no evidence as to the latter accusations of bribery in briefing or at our three evidentiary hearings.

S.A. Mission is by no means a faultless franchisee but, it has raised a sufficiently serious question going to the CORE regime. The CORE program is not mentioned in the agreements. The agreements refer only to generic cleanliness image standards in the case of the gas agreement and further to the manual in the case of the am/pm agreement. To sustain a termination, BPWCP must persuade a jury that the standards set forth in the agreements were violated. A jury may (or may not) agree with BPWCP that the CORE inspection failures translate to violations of the image standards in the agreements.

In undertaking a fairness analysis of the CORE program, the Court took a hard look at each and every question in the CORE inspection reports. Based on that review, certain CORE inspection questions exhibited examples of dubious authority (Dkt. No. 54-6), double dipping (Dkt. No. 54-5 at 14–15, § 13, Qs 16, 18), and point deductions without supporting evidence, *i.e.*, photos of the purported infractions (Dkt. No. 54-3 § 3, Q 11).

For example, in the CORE inspection report dated May 2, 2017, S.A. Mission lost points for not having a produce "source log" (Dkt. 54-5 § 1, Q 13). The systems manual, however, required no such thing. The requirement was simply that the "Operator/Mini-Market Manager must retain receipt of purchase for traceability in the event of a recall" (Dkt. No. 89-1 at 40). S.A. Mission claims to have retained all receipts and invoices which, if true, would satisfy this requirement (assuming adequate vendor and product information is listed).

Another example involved the fruit merchandiser. S.A. Mission received zero points for having sold out of bananas, despite having apples and oranges available for purchase (Dkt. No. 54-6 § 7, Q 12). The systems manual, however, only required that the "[f]ruit merchandizer must be available and stocked" (Dkt. No. 89-1 at 41). This question again overreached beyond the manual and thus the contract.

A separate problem concerns compound questions in the CORE inspection. These questions that cluster elements may unfairly deduct points that otherwise would be deserving. For example, a compound question might cover five elements. A franchisee could pass as to

7

four and not pass on one but lose all five points merely because of goofing up on one element. BPWCP was the one who decided how to group the elements and to impose an "all or nothing" scoring mechanism as to compound questions. A jury might decide that the "all or nothing" system led to an unfair evaluation.

It is further worrying that the CORE inspection seems to be a moving target at times. Both the questions and the allocation of points in the CORE inspection seem to change each quarter whereas the systems manual, on which the questions are based, is updated on an annual basis (Dkt. No. 89 ¶ 6).

The issue of potentially arbitrary point allocation is exacerbated by the fact that BPWCP automatically deducted fifty points from the inspection's total score if the franchisee received less than 80 percent in Section 1 (the Food Safety Index). Though food safety is obviously important, this penalty further raises the specter of the CORE program's arbitrariness, as the total score for any given inspection ranges anywhere between about 450 to 550 possible points (depending on which questions happened to apply to that inspection). This "standard" penalty, therefore, varies between nine and eleven percent depending on the quarter.

Also suspect are the seemingly phantom questions uncovered at the December 19, 2018, evidentiary hearing, where certain questions are "scored differently" than others. For example, in scrutinizing Questions 16 and 22 of Section 1 (which relates to the Food Score Index) in the December 2017 CORE inspection report, the Court observed that S.A. Mission passed those questions yet received no points for passing. This was so despite those questions having seven-point values as denoted in the 2017 am/pm operation inspection survey summary (Dkt. No. 117 at 279:18–24, 281:21–23; Exh. 277).

BPWCP's witness Matthew Chandik subsequently attempted to address this discrepancy by stating that those questions related to the "basics of the site operation" and were thus weighted differently. That is, since 2013 (when the CORE program was launched), BPWCP chose not grant any points in connection with some "CORE questions" it considered so fundamental that meeting them earned no points but flunking them cost points (Dkt. No. 117 at 392:7–14). This "heads I win, tails you lose" explanation seemed to have come out of thin air

8

and was nowhere in writing or on the scoring sheet supposedly available to franchisees to understand how the scoring would work (Exh. 277).[3]

Moreover, BPWCP provided this convoluted summary document to franchisees on an annual basis (*i.e.*, the questions as well as their scoring weight are altered every year). This summary detailed "the specific section, question number . . ., the question text, [and] the interpretation [of the] text" (Dkt. No. 117 at 393:2–4). It also included "several additional columns," with one column identifying "the point value associated with each [defaultable] question" and another identifying "the question style" (*id*. at 393:5–8). Given that the Court had difficulty following the summary and how it related to the inspection report even after the witness's explanation, a jury might plausibly find unreasonable BPWCP's theory that franchisees would stay apprised of how the CORE regime would work.

Any test to terminate a franchise must be fair and reasonable when taking into account the objectives of the agreements. Taking the record as a whole, a jury might reasonably conclude (or not) that the CORE inspection, as administered to S.A. Mission, did not fairly translate to a violation of the image standards.

When a franchise agreement imposes a general requirement to maintain image standards, the franchisor may presumably adopt specific but reasonable image standards, communicate them to its franchisees, and terminate those who fall short, at least after notice and opportunity to cure. In turn, to police the standards, the franchisor may presumably devise an objective list of inspection questions and compose a scoring scheme so long as the list and scheme are fair and reasonable in light of the objectives of the franchise. The administration of the inspection and scoring must also be uniform across all stations, meaning that if the standards are read into one agreement, they must be read into all like it. Leniency as to one would mean leniency as to all. But it will still be up to a jury to say whether or not a flunking grade in the instant action translates to a violation of the image standards required by the contract. Here, a jury could plausibly disagree (or agree) with BPWCP.

---

[3] And, the summary document itself contained errors. For example, the witness conceded that though Question 16 was identified as a CORE question, the summary document erroneously omitted this identification (Dkt. No. 117 at 395:14–23).

9

### B. Serious Questions Exist Regarding CORE's Application to Separate Franchise Agreements.

The am/pm agreement contains a one-way cross-default provision whereby the mini market franchise may be terminated if the gas agreement is terminated. The provision states that "[i]n the case of Concurrent Operations at the Premises, BPWCP may terminate this Agreement upon termination of any one other franchise agreement" (Dkt. No. 18-2 § 18.05). *Significantly, the gas agreement has no similar cross-default provision.*

The main criticisms in the CORE inspection reports here concentrated on the am/pm mini market, less so on the gas station — but the CORE reports did not identify which franchise the points were assigned to. Yet BPWCP seeks to use its single CORE inspection as a ground to terminate both franchises. On the current record, it is unclear whether BPWCP has shown that the gas station alone would have scored below the 70 percent threshold, even assuming below 70 percent would translate to a contract violation.[4]

BPWCP claims that S.A. Mission's "CORE inspections included the very same questions used to inspect ARCO gas only stations" (Dkt. No. 107 at 8). There is no doubt that S.A. Mission's repeated failures included some deficiencies in the gas station franchise (*e.g.*, incomplete windshield washing stations). But because the CORE inspection used here is a single assessment, it is not clear whether each franchise would have independently failed. BPWCP has not put in evidence a gas-only version of the CORE inspection for comparison, nor has it attempted to sort out the unified inspection report. The Court and jury cannot be expected to tease apart and separately apply BPWCP's questions, nor can it know what the gas-only inspection report would entail.

BPWCP has rested its case on an all-or-nothing basis (Dkt. Nos. 99 at 97; 107 at 7–10). Since BPWCP has not carried the day as to "all," it must wind up with "nothing," at least at this stage. Because there is no cross-default provision in the gas agreement, it is all the more

---

[4] This order again notes that the gas agreement does not mention the store systems manual, let alone the CORE program. BPWCP argued during the evidentiary hearing that S.A. Mission could be independently found in violation of the gas agreement's image standard provision even without the benefit of the CORE program. Again, however, a jury might plausibly find otherwise.

10

important for BPWCP to prove that each of S.A. Mission's franchises would score below the 70 percent threshold.

In sum, S.A. Mission has raised sufficiently serious questions going to the merits such that a jury could reasonably conclude that the CORE inspection results are not a valid ground for termination in this case. The separate issue of basing independent termination on a single unified inspection paired with the lack of cross-default also raises sufficiently serious questions calling into question BPWCP's termination of both franchise agreements.

### 3. BALANCE OF HARDSHIPS.

This order finds that the balance of hardships tips sharply in favor of the franchisee. This is not to say that BPWCP does not have its own hardships if the parties must live together for a while longer. Some of S.A. Mission's shortfalls are concerning. This in turn has the potential to negatively affect other compliant franchisees (due to threats to the brand image) (Dkt. No. 35 at 10; 70 at 13). (S.A. Mission's recent passing performances on the November and December CORE inspections, however, tend to mitigate BPWCP's hardship slightly.)

These concerns, however, are heavily outweighed by the immediate hardship that would be imposed on S.A. Mission, its owner and principal operator Naifeh Azar, and her family who work at the franchises and who rely on the franchises to earn a living. This is particularly true in light of the fact that a restrictive covenant (also incorporated by BPWCP) prohibits S.A. Mission from selling any other type of motor fuel or operating any convenience store or fast food restaurant other than the am/pm mini market until March 2027. S.A. Mission's only feasible options would be to either find a replacement franchisee for S.A. Mission (and thus effectively act as a landlord) or sell the property.

### 4. IRREPARABLE HARM.

Irreparable harm is likely if the preliminary injunction is not granted. Termination of S.A. Mission's franchises would cause its business to fail, the loss of goodwill, and deprive its owner's family of its current source of income (Dkt. No. 17 at 2, 10). Absent this preliminary injunction, irreparable harm is a near certainty.

11

**5.    PUBLIC INTEREST.**

BPWCP's attempted termination seem largely based on S.A. Mission's failure to maintain "image standards" and concerns over product freshness rather than food safety. As for health and safety concerns, BPWCP's claims of potential consumer harm are mitigated by S.A. Mission's current passing food safety score of 92 from the San Francisco Department of Public Health and the recent passing CORE inspection scores in November and December 2018 (*see* Dkt. No. 54-4 at 16). On balance, this order finds that the public interest factor favors injunctive relief.[5]

**CONCLUSION**

Pending trial and/or further order, BPWCP is preliminarily enjoined from terminating S.A. Mission's gas and am/pm market agreements on condition of a bond in the amount of **$60,000** to be posted by **JANUARY 18 AT NOON**. BPWCP may continue random and unannounced inspections at will.

Trial is hereby **SET** for **JUNE 17 AT 7:30 A.M.** At trial, no reference shall be made to this order or to any preliminary injunction by anyone, including counsel or witnesses or the parties, in the presence of any juror or potential juror. No suggestion shall be made that the Court in any way has questioned the CORE regime.

**IT IS SO ORDERED.**

Dated: January 3, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[5] S.A. Mission filed a "reply brief" and a supporting reply declaration by Naifeh Azar to BPWCP's supplemental brief on October 9 (Dkt. Nos. 63, 63-1). BPWCP moves to strike, arguing that such filing was unauthorized and untimely (Dkt. No. 65 at 2). BPWCP moves in the alternative for leave to respond to S.A. Mission's reply. BPWCP's request for leave to file a response is **GRANTED**.